64620. COLONIAL PIPELINE COMPANY v. ROBERT W. HUNT COMPANY.

BIRDSONG, Judge.

Robert W. Hunt Company, appellee, sued Colonial Pipeline Company, appellant, for monies due for pipe inspection services performed by Hunt for Colonial. Hunt, as an impartial third-party

inspector, agreed to inspect and did inspect specified foot lengths of pipeline being manufactured for Colonial by certain steel mills. The basis of Hunt's complaint for monies owed was that the steel mills overran the scheduled or projected time required to produce Colonial's pipeline, and thus more time was required for Hunt to inspect the pipeline during manufacture.

The essential facts of the written contractual agreement between Hunt and Colonial are these: Colonial submitted to Hunt an inquiry setting forth the specific jobs and pipeline lengths to be manufactured, and asking Hunt to "please quote prices firm through completion." On this inquiry form, Hunt quoted the jobs on a cents "per foot" basis, and noted thereon: "Our attached letter proposal dated August 31, 1979 forms an integral part of this quotation." Hunt signed the inquiry document after placing its quotation thereon, under a printed statement that "[i]f favored by an order, we agree to furnish items enumerated hereon at prices *and under conditions indicated.*" (Emphasis supplied.) The letter attached by Hunt to the inquiry form, stated: "Based on total number of production turns received by each mill for your 36-inch pipe, Hunt quotes the following for mill inspection:

| MILL | TOTAL FEE | PER FOOT | MILL PRODUCTION HRS. |
|------|-----------|----------|----------------------|
| USS/McKeesport | $14,186 | 6.6¢ | 288 |
| Beth/Steelton | 17,377 | 6.1 | 320 |
| Kaiser/Napa | 17,188 | 7.6 | 320" |

Colonial replied with purchase orders which described the mill and footages of pipeline, and under the price column for each, stated only the cents-per-foot rates quoted by Hunt, just as Hunt had quoted on Colonial's inquiry form, and stating, "prices firm through delivery." Colonial's purchase orders made no reference to the projected mill time schedule, which Hunt had incorporated as "an integral part of this quotation" by reference to its attached letter. After receiving Colonial's purchase orders, Hunt, by reply letter, thanked Colonial for the assignments and in connection with requesting a correction on a two-cent error by Colonial, stated: "You will note our proposal is based on covering the mill scheduled number of turns for your order, therefore, the two cents per foot, although seemingly a small number, comes to 1.1 turns of coverage when extended over the total order." During the jobs, Colonial and Hunt apparently orally negotiated and discussed an additional pipe loading inspection. Colonial issued a purchase order pricing the job at 1.11 cents per foot; while the job was proceeding, Hunt replied by letter: "Our verbal quote was based on

the girth-welding schedule of 23 days." After the jobs were done, Hunt billed Colonial for the extra inspection time required by the mills' overruns, calculating the reasonable value on a basis proportionate to the original cents-per-foot job quote per scheduled mill production hours.

The trial judge denied Colonial's motion for directed verdict and ultimately gave judgment to Hunt for the "extra and additional work which Colonial authorized and accepted." On appeal Colonial excepts to these rulings and complains of errors inherent in them, as well as the admission of evidence that the custom in the trade required extra pay for extra inspection work required by mill overruns. *Held:*

Essentially, Colonial contends Hunt agreed to do the inspection jobs on a "per foot" basis and is not entitled to payment for extra time required to inspect the footage because of mill overruns. Colonial contends that if Hunt's quotations were based on projected schedule time, they were nevertheless offers which Colonial counter-offered by its purchase orders stating only a "per foot" rate of compensation, which counter-offers Hunt accepted by its letter thanking Colonial for the assignments and merely requesting the two-cents error change.

Appellant Colonial Pipeline expounds the relative merits of the language of the documents, and of the documents as contract offers, counter-offers, variations, or acceptances, and in general expresses profound mystification that the trial court went outside the clear terms of the documents and received evidence of trade custom and usage, and on a quantum meruit basis granted judgment to Hunt for its extra-work claims. Hunt replies in kind. There are more facts in the case than we recite here, and many more arguments made, but we see no reason to explore them because they are immaterial to the interpretation of the parties' agreement.

The cardinal rule of construction of a contract is to ascertain the intention of the parties. *Brooke v. Phillips Petroleum Co.,* 113 Ga. App. 742, 744 (149 SE2d 511). Hunt says the extra pay for extra work is inherent in its quotations and in Colonial's purchase orders. We think the language quoted from the documents in this case, particularly in light of the conflicting claims and positions of the parties arising therefrom, shows that the ultimate agreement was sufficiently ambiguous, latent and patent, so as to permit evidence in explanation thereof (Code Ann. § 20-704 (1)) and so as to permit evidence concerning the custom and usage in the trade. *Biltmore Constr. Co. v. Tri-State Elect. Contractors,* 137 Ga. App. 504, 508-509 (224 SE2d 487). The evidence shows that since third-party pipeline inspection during manufacture necessarily depends upon the

manufacturing (and perhaps re-manufacturing) process, the custom in the trade requires extra pay for extra inspection work necessitated by fault of the manufacturing process. We are not surprised that this is the custom in the trade because it makes such eminent good sense. In the face of the ambiguity of the documents comprising the agreement of the parties, the obligation to pay extra for extra work is of such compelling logic and is of such usual custom in the trade, as to be necessarily implied in the contract. Code Ann. § 20-704 (3).

Moreover, in determining whether Colonial's purchase orders reciting only Hunt's "per foot" price constituted a significant variation of Hunt's quotation based on mill production hours so as to amount to a counter-offer accepted by Hunt, we look to paragraph 5 of Code Ann. § 20-704: "If the construction is doubtful, that which goes most strongly against the party executing the instrument, or undertaking the obligation, is generally to be preferred." See also *Brooke v. Phillips Petroleum Co.,* supra, where we held pursuant to Code Ann. § 20-704 (5) that "in cases of doubt, the contract will be construed most strongly against the one who prepared the instrument. [Cits.]" Hunt unambiguously quoted a "per foot" rate based on the individual mill's scheduled production hours. If the inclusion of the mill's production hours in the rate quoted has any significance, and as a basic rule of interpretation we presume that it does, it means that if the scheduled production hours were exceeded by the mill, the payment for inspection work would suffer some modification per the usual custom in the trade. In placing its quotation on Colonial's inquiry form, Hunt itself quoted only the cents "per foot" rate, but by integration of its attached letter made it clear that this quotation was inherently based on scheduled production hours. The language and terms stated in Colonial's purchase orders are not so clear and specific as to show that, by stating the per foot rate alone (which after all was exactly as Hunt had done in its quotation, but inherent in which was the scheduled mill hours as a basis), Colonial intended thus to depart from the terms of Hunt's quotations and from the usual custom in the trade, so as to get Hunt to do the job per foot of pipeline ultimately produced without regard to the number of hours or days it took for the mill to produce the specified quality pipeline. Under the rule of contract construction previously quoted (Code Ann. § 20-704 (5)), we interpret Colonial's purchase orders, which stated as the price the quoted "per foot" rate only, to include the mill production schedule as the basis for the rate, by necessary implication, as inherent in the "per foot" price, and that the language "prices firm through completion" meant the same as a matter of logic and by necessary implication according to the custom

in the trade (Code Ann. § 20-704 (3)).

Furthermore, the whole contract documents, including Hunt's letter of reply to Colonial's purchase orders, must be looked to in construing any part of the contract (Code Ann. § 20-704 (4)). This letter, stating "You will note our proposal is based on covering the mill scheduled number of turns for your order . . .," though stated in connection with a two-cent error change, indicates Hunt understood Colonial's purchase order stating a "per foot" price, by necessary implication, to inherently include as its basis the mill production hours and presumption that the pipeline would be produced within that time, and that otherwise compensation would be as usual in the trade. Moreover, the letter language indicates at best that, if there were any latent or patent ambiguity in Colonial's purchase orders, Hunt continued to qualify its acceptance of the job as grounded on its original quotation based on mill production schedule, and perhaps even intended to clarify any possible misunderstanding of Colonial in quoting the per foot rate alone in its purchase orders.

We are not overly concerned with superficial distinctions as to concepts of offers, counter-offers and acceptances. But to the extent that such formulation is relevant to determine the agreement of the parties, it should be clear from what we have said in interpreting the documents in this case, that we conclude as follows: that Hunt's quotations were the offer and Colonial's purchase orders were acceptance of that offer. Colonial's purchase orders were not sufficiently and clearly at variance with Hunt's offer as to unambiguously evince a clear intention of Colonial to depart from the offer's basis and from the custom in the trade that the per foot rate was based on projected production hours and that extra inspection work for fault in production would earn extra pay. And at least, if it was Colonial's intention to make a counter-offer by pricing its purchase orders at only the per foot rate, it is clear that Hunt, by its letter of reply did not accept that counter-offer, but insisted on its original quotations as being based on projected mill schedule, and the evidence clearly shows Hunt proceeded with performance, including extra inspection work beyond the mill's scheduled projection hours, without further notice or protest from Colonial. See Code Ann. § 20-116.

The reasonable value of Hunt's extra work was computed at the same rate "per foot" on a basis proportionate to the original quote per scheduled mill hours production. The price was thus inherently "firm through completion," as unambiguously demanded by Colonial in its purchase order, and as quoted by Hunt in its quotation.

We find no error in the trial court's judgment.

*Judgment affirmed. McMurray, P. J., and Banke, J., concur.*

DECIDED OCTOBER 22, 1982.

*Ross Arnold, Alton H. Hopkins,* for appellant.
*Charles Choyce,* for appellee.